UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


JAMES COOKE, ET AL.,                    )
                                        )
            Plaintiffs,                 )
                                        )           CIVIL ACTION NO.
VS.                                     )
                                        )           3:07-CV-1120-G
UNITED STATES OF AMERICA,               )
                                        )               **ECF**
            Defendant.                  )



## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendant, the United States of America,

("the United States" or "the defendant") for summary judgment against the plaintiffs,

James Cooke, Carole Cooke, Megan Cooke, and Thomas Cooke (collectively, "the

plaintiffs"), under Rule 56 of the Federal Rules of Civil Procedure.  For the reasons

set forth below, the motion is denied.

## I. BACKGROUND

James Cooke ("Cooke") was a patient of Dr. Erik Blois, a psychiatrist at the

Dallas Veterans Administration Medical Center ("the Dallas VAMC"), from

approximately October of 2003 through December of 2004. Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 10 n.10 ("Motion for Summary Judgment"); Plaintiffs' Original Complaint ("Complaint") ¶ 6.2. On or about December 11, 2004, Cooke arrived at the Dallas VAMC emergency room complaining of numbness to his entire right side, and was found to have suffered from a stroke. Complaint ¶¶ 6.4, 6.5; Motion for Summary Judgment at 2, 7.

According to the plaintiffs, from February 2004 until the date of Cooke's stroke, Dr. Blois regularly prescribed Cooke the medications venlafaxine and citalopram hydrobromide, anti-depressants more commonly known as Effexor and Celexa, respectively. Plaintiffs' Memorandum of Argument and Authorities in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Plaintiffs' Response") at 2. Both drugs independently produce a known side effect of increased blood pressure. *Id.* The plaintiffs claim that "[p]rior to Dr. Blois' prescription of Celexa and Effexor, Mr. Cooke consistently exhibited normal blood pressure readings and never required anti-hypertensive treatment." *Id.* However, following Dr. Blois' prescription, Cooke "began experiencing consistent high blood pressures." *Id.* Cooke informed the defendant of the increase, but the defendant "failed to monitor Mr. Cooke's blood pressure levels," "did not discontinue the Effexor and Celexa prescriptions [,] and did not treat Mr. Cooke's new onset of hypertensive blood pressures." Complaint ¶ 6.3; Plaintiffs' Response 2-3. According

to the plaintiffs, the defendant's negligence caused Cooke to suffer "an acute posterior left pons infarct" resulting in "permanent, severe, life threatening physical injury and damage . . . including, but not limited to, permanent physical and mental impairment."  Complaint ¶¶ 6.5, 6.6.  Furthermore, the plaintiffs claim that "[t]he Dallas VAMC medical records document that Mr. Cooke suffered from a hypertensive stroke secondary to the medication prescribed by Dr. Blois."  Plaintiffs' Response at 3.

According to the United States, Cooke came to the Dallas VAMC with "existing co-morbidities [sic] which had been treated by his private physicians prior to Mr. Cooke's initial presentation for treatment at [the Dallas VAMC]."  Motion for Summary Judgment at 1.  Furthermore the defendant claims that "Cooke had abnormal hypertension prior to receiving [Effexor]" and "Cooke's blood pressure . . . did not rise substantially while on Effexor."  *Id.*  The United States points out that "Cooke had numerous other health factors that likely contributed to his stroke."  *Id.* at 2.  Additionally, the defendant refers to medical records from the Dallas VMAC which "show that James Cooke's blood pressure was routinely taken when he came to the primary care clinic," and argues that Dr. Bois "accessed [these records] when he saw James Cooke in the mental health clinic."  *Id.* at 9.  Additionally, the United States asserts that "Dr. Blois had instructed James Cooke to monitor his blood pressure and to report elevated readings to the primary care clinic."  *Id.*  Dr. Blois

purportedly also set "end-points" for the expected side effects of the Effexor prescription. *Id.* at 10. According to the United States, the initial dosage of Effexor prescribed by Dr. Blois was "low (37.5 mg)." *Id.* Finally, the defendant claims "venlafaxine (Effexor) did not cause or contribute to James Cooke's stroke and there was no standard of care failure." *Id.* at 12.

The plaintiffs bring this suit pursuant to the Federal Tort Claims Act ("FTCA"), seeking monetary damages resulting from personal injuries to James Cooke. Complaint ¶ 6.1. They maintain that the defendant was negligent "[i]n failing to timely and properly treat," "care for," "monitor," "prescribe medication to," "evaluate," and "diagnose" Cooke. Complaint ¶ 7.1. Specifically, the plaintiffs claim that the United States "had a duty to closely monitor the side effects of the prescribed drugs, and [to] adjust the medical regimen based on close and ongoing monitoring." Plaintiffs' Response at 7. However, according to the plaintiffs, the United States' employees "breached the standard of care because they failed to recognize the link between Mr. Cooke's hypertensive readings and the drugs they prescribed," "fail[ed] to enact reasonable measures to treat Mr. Cooke's hypertension," and failed to "decrease or eliminate the Effexor dosage, decrease or eliminate the Celexa dosage, and supplement[] the anti-hypertensive . . . prescription." *Id.* at 8. According to the plaintiffs, such negligence "proximately caused all of the injuries and damages sustained by the [p]laintiffs," including, but

not limited to, "[p]ast and future pain, suffering and mental anguish," "[p]ast and [f]uture physical impairment," "[p]ast and [f]uture mental impairment," and "[p]ast and future economic loss." Complaint ¶¶ 7.2, 8.1.

The United States moves for summary judgment on the plaintiffs' claims "based upon the inability of [the] plaintiffs to meet the requisite standard of care and causation showing which they have alleged."[1] Motion for Summary Judgment at 1. Specifically, the defendant claims that "the cause of [Cooke's] stroke was not venlafaxine (Effexor) and Dr. Blois met the standard of care in the community with respect to James Cooke." *Id.* at 11.

## II. ANALYSIS

### A. Evidentiary Burdens on Motion for Summary Judgment

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving parties are

---

[1] Additionally, the plaintiffs have submitted a surreply containing what they consider to be necessary counterpoints to the defendant's reply brief, as well as a quotation from William Shakespeare's Romeo and Juliet. *See* Plaintiffs' Surreply to Defendant's Reply to Plaintiff's Motion for Summary Judgment Response at 3 n.1. The court applauds the plaintiffs for their clever attempt at literary allusion, as well as the corresponding explanation of the quote (the meaning had always escaped the court). The court is reminded of the phrase "less is more," generally attributed to the American architect Ludwig Mies van der Rohe. The court finds that the parties have sufficiently addressed the issues presented for summary judgment in the course of normal briefing, and finds it unnecessary to consider the plaintiffs' surreply.

entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).[2] "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986). The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. FED. R. CIV. P. 56(c).

Once the movant makes this showing, the nonmovants must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). Instead, the nonmovants must show that the evidence is sufficient to support a resolution of the factual issue in their favor. *Anderson*, 477 U.S. at 249.

---

[2] The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

While all of the evidence must be viewed in a light most favorable to the motion's opponents, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movants' summary judgment burden. *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Summary judgment in favor of the movant is proper if, after adequate time for discovery, the motion's opponents fail to establish the existence of an element essential to their case and as to which they will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

## B. Medical Malpractice Claim

According to the Federal Tort Claims Act:

> district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

The alleged acts or omissions occurred in Texas, which means the substantive law of Texas controls the plaintiffs' allegations. See *id.*; see also *Richard v. United*

*States*, 2008 WL 2775486, at *4 (N.D. Tex. July 14, 2008). Under Texas law, a plaintiff alleging medical malpractice must prove the following four elements: "(1) a duty by the physician to act according to a certain standard of care, (2) a breach of the applicable standard of care, (3) injury or harm to the plaintiff, and (4) a causal connection between the breach of the applicable standard of care and the injury or harm." *Brandt v. Surber*, 194 S.W.3d 108, 115 (Tex. App.--Corpus Christi 2006, pet. denied); see also *Morrell v. Finke*, 184 S.W.3d 257, 271 (Tex. App.--Fort Worth 2005, pet. denied).

Standard of care is "[t]he threshold question in a medical malpractice case." *Jones v. Miller*, 966 S.W.2d 851, 854 (Tex. App.--Houston [1st Dist.] 1998, no pet.). Where the defendant moves for summary judgment in a medical malpractice case, he must provide expert testimony which "identif[ies] the relevant standard of care, establish[es] that the expert is familiar with that standard, and specifically demonstrate[s] that the medical care provided complied with the standard of care." *Id.* It is insufficient for the expert to "simply state that he or she knows the standard of care and concludes it was met." *Id.* In order to raise a material fact issue sufficient to defeat summary judgment, "the plaintiff's controverting expert should specifically identify the standard of care, establish the expert's familiarity with that standard, and explain why the treatment rendered by the defendant health-care provider breached the applicable standard." *Garnett v. Ghafoori*, 2008 WL 525456, at *6 (Tex. App.--

Corpus Christi Feb. 28, 2008, no pet.) (citing *Hightower v. Saxton*, 54 S.W.3d 380, 389 (Tex. App.--Waco 2001, no pet.); see also *Woods v. TDCJ*, 2008 WL 189562, at *13 (S.D. Tex. Jan. 18, 2008). "Testimony that a defendant's conduct fell below the degree of care required creates a fact issue for summary judgment purposes." *Woods*, 2008 WL 189562, at *13.

The plaintiffs are required to show "evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were proximately caused by the negligence of one or more defendants." *Park Place Hospital v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); see also *Morrell*, 184 S.W.3d at 271. In other words, the plaintiffs must show "that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Memorial Hospital*, 858 S.W.2d 397, 400 (Tex. 1993). The causal connection must be "based upon a 'reasonable medical probability' and not upon mere conjecture, speculation, or possibility." *Morrell*, 184 S.W.3d at 272. "[T]he ultimate standard of proof on the causation issue is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Kramer*, 858 S.W.2d at 400. It is possible for more than one act to be the proximate cause of the same injury. *Lee Lewis Construction, Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). The trier of fact is generally allowed to decide the causation issue: "(1) when general experience and

common sense will enable a layman fairly to determine the causal relationship between the event and the condition; (2) when scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) when [a] probable causal relationship is shown by expert testimony." *Lenger v. Physician's General Hospital, Inc.*, 455 S.W.2d 703, 706 (Tex. 1970); see also *Morrell*, 184 S.W.3d at 272.

## C. Discussion

### 1. *Causation Element*

The United States has failed to identify portions of the record which reveal there is no genuine material fact issue regarding causation. See *Celotex Corporation*, 477 U.S. at 323. In an effort to do so, it asserts that (1) the opinions of the plaintiffs' experts are erroneously based on "the existence of a bleed stroke (hemorrhagic);"[3] (2) "prior to [the date on which Effexor was initially prescribed], . . . Cooke had co-mobidities consistent with occlusive stroke risk;"[4] and (3) the plaintiffs' experts fail to cite studies or reports for certain assertions within their theory of causation.[5] However, for the reasons discussed below, a material fact issue exists despite the United States' assertions.

---

[3]    Motion for Summary Judgment at 8.

[4]    *Id.* at 11.

[5]    *Id.* at 9; United States Reply in Support of Motion for Summary Judgment ("Defendant's Reply") at 3-4.

According to the United States, the opinions of the plaintiffs' experts hinge on Cooke having had a hemorrhagic stroke. Motion for Summary Judgment at 8. Because "James Cooke did not have a hemorrhagic (bleed) stroke," the defendant posits, "[n]either expert is correct on the medical record facts." *Id.* at 8. Therefore, the defendant reasons, (1) because the opinions of the plaintiffs' experts are based on incorrect medical record facts and (2) because "[t]he objective medical facts necessarily exclude the existence of a causal relationship" between Effexor and Cooke's stroke, there is no genuine material fact issue regarding causation. *Id.* at 8. Both components of the defendant's argument are flawed.

First, the plaintiffs' experts explicitly state that Cooke did not suffer a hemorrhagic stroke. Dr. Richard C.W. Hall ("Dr. Hall") states that "Cooke suffered a hypertensive stroke, although not a hemorrhagic one." Declaration of Richard C.W. Hall, M.D. ("Hall Declaration"), *located in* Plaintiffs' Appendix *at* 8. Dr. Lige B. Rushing, Jr., states that "the reports of Mr. Cooke's MRI/MRA do not describe either a hemorrhagic or occlusive stroke" and that he "do[es] not dispute Dr. [J. Neal] Rutledge's conclusion that [the stroke] was not hemorrhagic." Declaration of Lige B. Rushing, Jr., M.D. ("Rushing Declaration"), *located in* Plaintiffs' Appendix *at* 14-15. Second, the "objective medical facts" referred to by the United States, Motion for Summary Judgment at 8, viewed in the light most favorable to the plaintiffs, do not

"necessarily exclude the existence of a causal relationship" between the Effexor Cooke was taking and his subsequent stroke.

The referenced medical facts appear to be (1) "neither the CT nor MRA/MRI radiological tests revealed a hemorrhagic bleed in the left posterior pons, but instead found there is a narrowing of the arteries in the left posterior pons"; (2) "[a] narrowing vessel is indicative of an ischemic stroke, not a hemorrhagic stroke"; (3) "[t]he stroke which Mr. Cooke suffered was . . . ischemic, not hemorrhagic"; and (4) "[t]he Cooke acute lacunar infarction was . . . caused by the narrowing of the very small arteries supplying the brainstem requiring years to develop." *Id.* at 7-8. However, Dr. Rutledge maintains that "[t]he MRA . . . shows no stenosis or occlusion of the basilar or vertebral arteries." Letter from J. Neal Rutledge, MD FACR ("Rutledge Letter"), *located in* Plaintiffs' Appendix *at* 22. According to Dr. Rutledge, "[t]he most likely etiology for this acute paramedian pontine lacunar infarct is thrombosis of one or more of the small penetrating arterial branches of the basilar artery caused by hypertensive hyalinization, *i.e.*, a hypertensive stroke." *Id.* at 23. Additionally, Dr. Rutledge states that "[h]ypertensive strokes can be occlusive or hemorrhagic" and that "classification of a hypertensive stroke as occlusive or hemorrhagic in nature does not rule in or rule out a drug related cause." *Id.* Dr. Hall likewise states that "classifying a stroke as occlusive or hemorrhagic does not resolve the central question of what caused the stroke" and that "both hemorrhagic and

occlusive strokes can be drug-induced." Hall Declaration at 8-9. Similarly, Dr. Rushing states that "drug induced hypertensive strokes can be either occlusive or hemorrhagic." Rushing Declaration at 17. Finally, the United States' own expert states that "the specific type of stroke does not definitively establish whether hypertension was a primary contributing factor." Second Declaration of Stephen C. Cannon, M.D., Ph.D. ¶ 9, *located in* Supplemental Appendix in Support of United States Reply *at* 3.

The United States further argues that "the medical facts of record establish that, prior to February 23, 2004, James Cooke had co-mobidities consistent with occlusive stroke risk." Motion for Summary Judgment at 11. These co-mobidities included "a 40 year history of smoking, hyperlipidemia dating back to 2002, atherosclerosis dating back to 2002, age, [and] possible hypertension dating back to 2002." *Id.* According to the United States, "it is impossible to sort out the relative contributions of these multiple risk factors for the specific case of James Cooke's stroke." Defendant's Reply at 3.

However, as stated above, "[m]ore than one act may be the proximate cause of the same injury." *Lee Lewis Construction, Inc.*, 70 S.W.3d at 784. The plaintiffs need not "establish causation in terms of medical certainty, nor . . . exclude every other reasonable hypothesis." *Thomas v. Farris*, 175 S.W.3d 896, 899 (Tex. App.-- Texarkana 2005, pet. denied). And the plaintiffs need not show that the defendant's

negligence was the sole cause of Cooke's injuries, but only that such negligence was "a substantial factor in bringing about the harm and without which the harm would not have occurred." *Kramer*, 858 S.W.2d at 400. Therefore, the existence of such co-mobidities does not preclude causation stemming from the defendant's actions.

The United States next points out that "neither Cooke expert cites to a single study or report which concludes that venlafaxine (Effexor) is connected in any way with an ischemic stroke." Motion for Summary Judgment at 9. Additionally, it argues that "[n]either Cooke expert cites to a single study which concludes that borderline hypertension, fluctuating blood pressure elevations, such as those recorded for James Cooke during the period February 23, 2004 to December 11, 2004, were connected to venlafaxine (Effexor) doses commencing at 37.5 mg/day for a few days, then increasing to 75 mg/day for several days, then maintained at 150 mg/day." *Id.* However, the plaintiffs' experts *do* provide evidence that Effexor may cause hypertension, and evidence that hypertension in turn may cause an ischemic stroke. Dr. Rushing states that "Effexor is reported in [medical] literature to cause hypertension in a delayed manner, after the patient has been on the drug for some time (several weeks)." Rushing Declaration at 18. Specifically, Dr. Rushing cites a study in which "54% of patients over 60 with preexisting hypertension experienced increases in blood pressure while taking Effexor" and "24% of those without preexisting hypertension experienced increases in blood pressure while taking

Effexor." *Id.* Dr. Hall, who utilizes Celexa and Effexor in his practice, states that

"Effexor may cause hypertension over time," and references the study cited by Dr.

Rushing. *See* Hall Declaration at 2, 6. Dr. Rushing states that "[b]ased on [his]

experience, education, training and review of the relevant medical literature, a

hypertensive stroke . . . can be drug induced whether it is occlusive or hemorrhagic."

Rushing Declaration at 15. Apparently, it is the United States' position that in order

to survive summary judgment, the plaintiffs must cite studies which show that

hypertension is connected to Effexor at doses corresponding to those prescribed to

Cooke. However, to defeat summary judgment, the plaintiffs are "not required to

establish causation in terms of medical certainty." *Thomas*, 175 S.W.3d at 899. Nor

must the plaintiffs establish a fact as a matter of law; rather, the plaintiffs, as

opponents of the motion, need only "raise an issue of fact material to the outcome of

the case." *Brumfield v. Ruyle*, 2007 WL 1018475, at *10 (Tex. App.--Fort Worth, no

pet.). The plaintiffs have done so regarding the connection between Effexor,

hypertension, and ischemic stroke.

The United States also argues that "Dr. Rushing was unable to identify . . . a

single peer review study or report which concluded that Celexa (citalopram) in the

dosage taken by Mr. Cooke had caused an increase of blood pressure." Defendant's

Reply at 4. However, Dr. Rushing does state that "[t]he PDR and medical literature

[he] . . . reviewed and relied upon . . . supports that hypertension is a known, but

- 15 -

uncommon, side effect of Celexa." Rushing Declaration at 18. Furthermore, as noted above with respect to Effexor, the plaintiffs need not identify a study which shows that hypertension is connected to Celexa at doses precisely corresponding to those prescribed to Cooke. Had Dr. Rushing failed to contend that hypertension is a side effect of Celexa, such omission would not be fatal to the plaintiffs' causation theory, which posits that Cooke's hypertension was caused, not necessarily by the Celexa dosage alone, but by the "Celexa and/or Effexor" dosages. *Id.* at 19.

Finally, even if it is assumed *arguendo* that the United States has identified portions of the record which reveal there is no genuine material fact issue regarding causation, the plaintiffs have directed the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. See *Celotex*, 477 U.S. at 322-23. The plaintiffs' experts provide scientific principles which "establish a traceable claim of causation," *Lenger*, 455 S.W.2d at 706, from Cooke's condition back to the defendant's alleged negligence. Therefore, the trier of fact should be allowed to decide the causation issue. *Id.*

Specifically, Dr. Hall sets out the traceable chain as follows: first, that "Mr. Cooke became hypertensive because of the effect of taking Effexor and Celexa." Hall Declaration at 7. Secondly, hypertension is a known side effect of both Effexor and Celexa, *id.* at 3-4, and "Cooke was hypertensive at every single appointment where his blood pressure was taken" while such drugs were prescribed. *Id.* at 7. Then,

"[f]ollowing discontinuation of Effexor and the addition of lisinopril, Mr. Cooke no longer had elevated blood pressures." *Id.* at 8.

Next, Dr. Hall asserts that the defendant "never recognized that Mr. Cooke had again developed hypertension while on Celexa and Effexor" and that "the link between Effexor and hypertension was never considered." *Id.* at 7. As a result, "[n]o reasonable measures (decreasing or eliminating the dosage of Effexor, decreasing or eliminating the dosage of Celexa, supplementing the [antihypertensive drug]) to eradicate Mr. Cooke's hypertension were taken." *Id.* According to Dr. Hall, these omissions occurred despite the fact that "the standard of care in Mr. Cooke's case required the VA healthcare providers to closely monitor the side effects of the prescribed drugs, as well as adjust the medical regimen based on close and ongoing monitoring." *Id.* at 5.

Finally, Dr. Hall asserts that such "Celexa- and Effexor- induced hypertension caused [Cooke] to have a stroke into his left pons." *Id.* at 9. This conclusion is based on a review of Cooke's films by a neuroradiologist who found Cooke's stroke to be "caused by hypertensive hyalinization, i.e. a hypertensive stroke"[6]; Dr. Hall's and the neurologist's conclusion that a hypertensive stroke need not be hemorrhagic[7]; the fact

---

[6]   *Id.* at 8.

[7]   *Id.* at 8-9.

that "Cooke's stroke occurred at the pons, a common site of hypertensive stroke"[8]; and the fact that "the VA healthcare providers who treated Mr. Cooke for his stroke confirmed that he experienced a hypertensive stroke." *Id.*

The court finds the conclusions of the plaintiffs' experts to be "evidence of a 'reasonable medical probability' or 'reasonable probability' that [Cooke's] injuries were proximately caused by the negligence of one or more defendants." *Park Place Hospital*, 909 S.W.2d at 511. Therefore, the defendant's motion for summary judgment is denied with respect to the issue of causation.

## 2. *Standard of Care Element*

"The standard of care demanded in medical malpractice cases requires skills not ordinarily possessed by lay persons," *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995), and, therefore, "expert testimony will be required to meet this burden of proof." *Hood v. Phillips*, 554 S.W.2d 160, 165-66 (Tex. 1977); see also *Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 899 (Tex. 2005).

Dr. Hall, one of the plaintiffs' experts, is a board certified psychiatrist who has been practicing psychiatry since 1972. Hall Declaration at 1. According to his declaration, Dr. Hall has "treated many patients similar [to] Mr. Cooke," has "utilize[d] Celexa and Effexor in [his] practice," is "familiar with the standard of care of health care providers when encountering and evaluating a patient to whom Celexa

---

[8]     *Id.* at 9.

and/or Effexor have been prescribed," and is "familiar with the standard of care in treating Celexa and/or Effexor-induced hypertension." *Id.* at 1-2. Furthermore, Dr. Hall reviewed Cooke's relevant medical records and the relevant medical literature before preparing his declaration. *Id.* at 2-3.

Dr. Rushing, also a plaintiffs' expert, is "an internal medicine physician, board certified in internal medicine, geriatrics, and rheumatology," and "licensed by the State of Texas to practice medicine." Rushing Declaration at 11. According to his declaration, Dr. Rushing "regularly treat[s] hypertension in [his] practice," has "treated many stroke patients and . . . regularly participate[s] in diagnosing the cause of stroke," and is "familiar with the causes and treatments of drug induced hypertension, including that caused by . . . Celexa and . . . Effexor." *Id.* at 12. Furthermore, Dr. Rushing treats geriatric patients like Mr. Cooke in his practice and is "familiar with the special issues and problems of the geriatric population." *Id.* Like Dr. Hall, Dr. Rushing reviewed Cooke's relevant medical records and the relevant medical literature before preparing his declaration. *Id.* at 12-13. Therefore, both of the plaintiffs' experts established their familiarity with the proper standard of care for treating patients in Cooke's condition. *Garnett*, 2008 WL 525456, at *6; see also *Hightower*, 54 S.W.3d at 389.

According to Dr. Hall, "[t]he standard of care for the treatment of patients on Celexa, Effexor, and especially when on both Celexa and Effexor is to monitor the

patient's blood pressure and to act upon hypertensive readings by intervening to lower the blood pressure on a long-term basis, such as decreasing the dosage of Effexor and/or Celexa or increasing the dosage of the antihypertensive medication (in this case, HCTZ)." Hall Declaration at 7-8. Similarly, Dr. Rushing states that "[t]he proper treatment of hypertension in Mr. Cooke's situation was to reduce or discontinue the offending agent (Celexa and/or Effexor) and/or adding antihypertensive medication." Rushing Declaration at 19. Therefore, the plaintiffs' experts have "specifically identif[ied] the standard of care." *Garnett*, 2008 WL 525456, at *6; see also *Hightower*, 54 S.W.3d at 389.

According to Dr. Hall, "[t]he VA medical records show that Mr. Cooke had adverse side effects (increased and hypertensive blood pressure readings) from Celexa and Effexor." Hall Declaration at 5. Dr. Hall avers that "[t]he VA documented these high blood pressure readings on numerous occasions and did not, as the standard of care required, adjust Mr. Cooke's treatment or medical regimen accordingly." *Id.* In other words, "no treatment was provided to lower and/or control Mr. Cooke's post Celexa and post Effexor hypertensive blood pressure readings." *Id.* Similarly, Dr. Rushing states that "the standard of care for treating hypertension was breached when the VA healthcare providers failed to recognize and treat [Cooke's] hypertension in a timely manner (prior to December 11, 2004)." Rushing Declaration at 19. According to Dr. Rushing, "[t]he VA health care providers further

breached the standard of care by not recognizing and acting upon the causative relationship between Effexor and hypertension." *Id.* Therefore, the plaintiffs' experts have "explain[ed] why the treatment rendered by the defendant health-care provider breached the applicable standard." *Garnett*, 2008 WL 525456, at *6; see also *Hightower*, 54 S.W.3d at 389.

The plaintiffs' experts -- having specifically identified the standard of care for a patient in Cooke's situation, established their familiarity with that standard, and explained why the defendant's treatment of Cooke breached the applicable standard -- have raised a material fact issue sufficient to defeat summary judgment. *Garnett*, 2008 WL 525456, at *6; see also *Hightower*, 54 S.W.3d at 389. The parties' experts disagree on the proper standard of care owed to Cooke and whether the defendant breached such a standard. This case presents a classic example of "battling experts" with respect to the standard of care issue. "In a battle of competing experts, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony." *Morrell*, 184 S.W.3d at 282. "The jury decides which expert witness to credit." *Id.* Therefore, the defendant's motion for summary judgment is denied with regards to the issue of standard of care.

## III. <u>CONCLUSION</u>

For the reasons set forth above, the defendant's motion for summary judgment is **DENIED**.

**SO ORDERED**.

August 18, 2008.

A. JOE FISH
**Senior United States District Judge**